### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JENNIFER NELSON, | ) |
| | ) |
| **Plaintiff,** | ) |
| | )   **CIVIL ACTION** |
| **v.** | ) |
| | )   **No. 05-2350-KHV** |
| SPRINT/UNITED MANAGEMENT CO., | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

### MEMORANDUM AND ORDER

Jennifer Nelson brings suit against Sprint/United Management Company ("Sprint"), alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, 29 U.S.C. § 623(d) and the Kansas Act Against Discrimination ("KAAD"), K.S.A. § 44-1001 et. seq. This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #29) filed June 2, 2006 and Plaintiff's Motion For Leave To File Surreply (Doc. #33) filed July 26, 2006. As an initial matter, the Court sustains plaintiff's motion for leave to file a surreply. For reasons stated below, the Court sustains defendant's motion for summary judgment in part.

### Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute

requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Rule 56(e) also requires

2

that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served

therewith."  To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards

those portions which are not shown to be based upon personal knowledge or otherwise do not

comply with Rule 56(e).  Maverick Paper Co. v. Omaha Paper Co., Inc., 18 F. Supp.2d 1232, 1234-

35 (D. Kan. 1998).

**Facts**

The following facts are either uncontroverted or, where controverted, construed in the light

most favorable to plaintiff:[1]

In August of 1997, Sprint hired plaintiff, a Hispanic woman, to work as Educational

Consultant II, at grade level 73.[2]  During her employment, plaintiff received several promotions and

pay increases.  In 1998, plaintiff became a full-time telecommuter, working out of her home in

Euless, Texas.[3]  In this position, plaintiff traveled and visited retail management sites.  Sprint applied

the same standards to plaintiff as other employees, and required her to follow Sprint policies and

procedures.  One such policy prohibited plaintiff from charging personal expenses on her corporate

credit card.

In 2001, Sprint promoted plaintiff to Educational Consultant IV, at grade level 76.

In 2003, Janelle Carpenter supervised plaintiff.  During this time, plaintiff used a corporate

---

[1]        The Court does not consider facts which the record does not support.  In addition, the Court does not consider facts which the parties include only in the argument section of their briefs and not in the statement of facts as required by D. Kan. Rule 56.1.

[2]        An employee's grade level determines compensation and benefits and demonstrates area of responsibility and position within the company's organizational structure.

[3]        The record is unclear whether plaintiff's move to this position entailed a promotion and/or pay increase.

credit card.  At times, plaintiff did not timely submit expense reports.  Plaintiff's corporate card account became delinquent because she did not turn in an expense report on time.  As a result, Sprint suspended plaintiff's credit card privileges.  In December of 2003, plaintiff's corporate credit card statement reflected personal charges which she incurred during a personal trip to Aruba.[4]

In late December of 2003 and early January of 2004, Sprint underwent a company-wide transformation in which the Sprint training and education department merged with the training department of Sprint PCS.  Scott Skibell began supervising plaintiff.  Skibell reported to Ginnie Hall.

As a result of the merger, plaintiff's position changed from Educational Consultant IV, at grade level 76, to Educational Consultant III, at grade level 75.  Sprint classified plaintiff's team members, Christy Smith, Tim Mings, and Chris Nastav at grade level 75.[5]  Plaintiff understood that Sprint took all team members to grade level 75 in an effort to equalize positions following the merger.  Plaintiff does not know who decided to classify her team at grade level 75, but she thinks it was Jed Dodd, vice president of the organization.[6]  Plaintiff does not think that Skibell was involved in the reclassification.  Sprint did not change the base compensation of employees who changed grade levels.  Accordingly, plaintiff's pay remained the same.

In addition to performing common work with her team members regarding systems and instructional design, plaintiff spent 20 to 80 per cent of her time working on issues regarding training

---

[4]     The record does not reflect the date on which Sprint suspended plaintiff's credit card privileges, or whether it was suspended at the time she charged personal expenses in Aruba.

[5]     Smith, Mings, and Nastav are Caucasian.  The record does not reflect their job grade levels before the merger.

[6]     Although the record is not clear, it appears that Sprint is composed of different organizations which in turn are composed of various departments.  The record does not reflect the name of the organization which encompassed plaintiff's department.

environment.  In doing so, she worked as a liaison between the training department, the client department and the information technology department ("IT").  Plaintiff's training environment work varied, depending on the project.  None of the other team members performed this work as part of his or her regular job duties, but Smith supported plaintiff in some weekly conference calls and provided back-up if plaintiff was unavailable.

Following the company-wide transformation, Hall noticed that Sprint had classified certain developers in other organizations at level 76.  For five months, Hall and her management team, including Skibell, worked to reclassify the developers in her organization from grade level 75 to grade level 76.  During this time, Skibell advocated to raise the grade level for his entire team, including plaintiff.

In May or June of 2004, Hall raised the job grade levels of Smith, Mings and Nastav to 76.  Hall did not raise plaintiff's grade level because she determined that plaintiff functioned primarily as a training environment trouble shooter, i.e. a technical support function, which did not meet the criteria for grade level 76 in Sprint's job description matrix.  Skibell believed that the matrix did not include plaintiff's technical support function because human resources did not understand how the role fit into the job description of Educational Consultant IV.  Skibell considered the technical support duties which plaintiff performed necessary and believed that plaintiff was the best in the group at performing the job.  Although plaintiff remained at grade level 75, however, she was the second highest paid person on the team.[7]

On June 30, 2004, plaintiff met with Skibell for her second performance review of 2004.  Skibell told plaintiff that of anyone on the team, she had the strongest grasp of adult learning and its

---

[7]     The record does not reflect whether plaintiff would have received a pay increase if Hall had elevated her to grade level 76.

application, and that her subject matter expertise was unquestionable.  Plaintiff asked what she needed to focus on in order to be promoted back to a level 76.  Skibell identified three things: ownership and subject matter expertise (SME) of a core project, project management and developing network enabled solutions.  When plaintiff asked how she could improve her performance, Skibell agreed that she was a strong performer in all three areas and told her that she should continue to do what she was doing. He further stated that they (he and plaintiff) needed to work on letting the people in Kansas City know all that plaintiff did.

A month later, on July 30, 2004, while plaintiff was researching contact information in Sprint's Outlook system, she learned that it listed all three of her peers (Nastav, Mings and Smith) as Educational Consultant IV (level 76), but still listed her as Educational Consultant III (level 75). Plaintiff immediately arranged a telephone appointment with Skibell to discuss the situation.  Skibell confirmed that Sprint had increased the grade levels of plaintiff's peers to 76, but not plaintiff. Plaintiff asked why Sprint had not increased her grade level.  Skibell suggested that as a telecommuter, she was not as visible as her peers; that she did not have a core project on which she primarily worked; that it was unfortunate that she was out on short-term disability when the E Ticket project came in because that would have been considered a core project;[8] and that Hall did not view plaintiff's "help desk" work as worthy of a grade level 76.  Skibell told plaintiff that he was equally responsible for her being "out of sight, out of mind."  Plaintiff did not understand what Skibell meant by "core project."  Skibell made up the term.[9]  Plaintiff discussed the three job factors mentioned at

---

[8]      Plaintiff was absent from work due to surgery from April 12 to May 11, 2004.  Sprint approved short term disability for this time period.  Plaintiff believed that Skibell's comment about her disability leave was inappropriate.

[9]      Other members of plaintiff's team also did not know what a "core project" was.

her performance review, and Skibell did not disagree that plaintiff had a higher level of skill, job responsibility and subject matter expertise than any of her peers.

Plaintiff believes that in not raising her grade level, Hall had followed Skibell's recommendation.  Plaintiff perceived that Skibell treated her differently than the rest of the team.  She thinks that Skibell did not recommend the grade level increase because she is "a Hispanic female, because [she] has a stronger command of [Skibell's] own department, because he relied so much on [her] to help him run his department and perhaps that was intimidating to him."  Nelson Depo. at 106:24-107:9, Exhibit 1 to Defendant's Memorandum (Doc. #30).  Nelson further believes that she intimidated Skibell because she knew more about systems development, had a stronger relationship with clients and stakeholders, and people in the organization knew her well and considered her "the go-to-person" rather than him.  Plaintiff believes that Skibell did not want her on his team because he was prejudiced against her because she was a strong, capable, intelligent Hispanic woman with a strong personality.  Plaintiff noticed Skibell's surprise and distaste when they interacted and she was speaking Spanish.  Plaintiff also noticed that Skibell was very nervous around her, and that his hand was clammy when she shook it.  Plaintiff testified that Skibell "never looked comfortable around [her]," used a "very hesitant" tone of voice with her; "never made eye contact" with her; and was "always very evasive."  Plaintiff observed that Skibell interacted differently with the other team members, and that Skibell did not interact with any other Hispanic employees.

On August 5, 2004, plaintiff sent an e-mail to human resources representative Linda Pickett, entitled "Formal Statement Request for Jennifer Z. Nelson."  Plaintiff wrote that she was "left to discern for [herself] possible reasons" that Sprint did not elevate her grade level to 76.  Exhibit 7 to

<u>Defendant's Memorandum</u> (Doc. #30).  Among several possible reasons, plaintiff suggested her race.

Specifically, plaintiff wrote:

- Minority status – I hate to write this, but if you look at the corporate development group under Ginnie Hall, the percentage of minorities is easily under 5%.  I never have considered my being Hispanic to be either an advantage or hindrance to my job performance. My work ethic, my customer relationships, and my deliverables speak for themselves.  However, again, when I am given no concrete reasons for behavior, I can only wonder what is happening.

<u>Id.</u>  Plaintiff also complained that Skibell could not provide clear measurable factors in job grade assessment, and that he had commented inappropriately regarding her disability leave.  Pickett requested and received plaintiff's permission to forward the e-mail to Hall and Skibell.  The next day, on August 6, 2004, Hall responded to the e-mail, stating that she would follow up on plaintiff's concerns and get back to her.  On the same day, Pickett informed plaintiff that Sprint determined her job grade based on the level of responsibility, decision making, accountability and skills/experience required, not individual performance.

On August 9, 2004, plaintiff met with Hall, Skibell and Pickett to discuss her concerns.  Plaintiff brought a copy of her complaint and began reading it.  Plaintiff also defined in detail the work that she did on a daily basis and discussed the amount of time which she spent on certain job duties.  Pickett asked Skibell why he did not tell plaintiff about her peers' job grade change during her performance review, noting that he should have done so in light of the small size of the team.  Pickett stated that she would work with Skibell and Hall to review the information which plaintiff provided.  Pickett also asked plaintiff to locate an IT position comparable to her work.  Thereafter, Pickett enlisted the compensation team to re-evaluate plaintiff's position.

The next day, on August 10, 2004, Nelson e-mailed Pickett to follow up on the re-evaluation

of her job grade level.  Nelson provided specific examples of Educational Consultant IV positions (level 76) which included the type of work that she performed.  Pickett replied that she would work with Hall and Skibell to review the information.  The same day, plaintiff had lunch with Smith, one of the team members who had received a job grade increase.  Smith stated that Skibell had told her not to discuss the job grade increase because not everyone on the team received it.

On August 10, 2004, Skibell announced that effective immediately, Suzie Scheer would supervise plaintiff's team.[10]  As supervisor, Scheer's duties included reviewing and approving expense reports submitted by her direct reports.  Before she began supervising plaintiff, Scheer knew that Carpenter had previously counseled plaintiff for improperly using her corporate credit card and for improperly expensing both gas and mileage for travel to retail stores and training in Dallas, Texas.

On August 12, 2004, plaintiff met Scheer for breakfast at a restaurant in Overland Park, Kansas.[11]  They discussed a number of work related issues, including plaintiff's job grade challenge.  Scheer did not act surprised when plaintiff told her about the complaint.  This led plaintiff to believe that Scheer must have already known about it.[12]

---

[10]     Defendant contends that Sheer became plaintiff's "official" supervisor on September 1, 2004, and that she "transitioned" into the role before that.  Defendant's Memorandum (Doc. #30) at 10, ¶¶ 61-62.  For purposes of ruling on defendant's summary judgment motion, the Court accepts plaintiff's assertion that Sheer became her supervisor on August 10, effective immediately.  See Plaintiff's Response (Doc. #31) at 16.

[11]     While plaintiff was in town, she asked to meet Scheer "face-to-face."

[12]     Plaintiff submits an affidavit which describes the meeting with Scheer.  See Plaintiff's Exhibit 11.  Defendant argues that the affidavit conflicts with plaintiff's prior deposition testimony.  At her deposition, plaintiff testified that besides Pickett, Hall and Skibell, she discussed her complaint with James Thacker, supervisor of another team.  Nelson Depo. at 182:5-184:11.  When asked whether she told anyone else, plaintiff replied, "I can't – I can't recall, I'm sorry."  Id.
(continued...)

On August 24, 2004, plaintiff followed up with Pickett regarding the re-evaluation of her job grade level.  The next day, Pickett advised plaintiff that the compensation person had been out sick, but was back and should have an answer soon.

On August 30, 2004, Scheer reviewed plaintiff's travel and expense report for the month of August.  Scheer noticed that the $150 PCS phone expense seemed high and asked Skibell to question plaintiff about it.[13]  That day, Skibell asked plaintiff about the expense.  Plaintiff responded that she had submitted charges which had accrued over several months.  Despite plaintiff's explanation, Scheer believed that the charges seemed high and continued to investigate the matter.[14]  She found that plaintiff's credit card account was in arrears and that plaintiff had submitted inaccurate expenses.  Scheer concluded that plaintiff had inflated phone charges which she was attempting to

---

[12](...continued)
at 184:12-13.

The Court will disregard affidavits which are inconsistent with prior sworn testimony if the changes attempt to create a sham fact issue.  See Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).  The utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony.  Id.  To determine if an affidavit is an attempt to create a sham issue of fact, the Court considers whether plaintiff was cross-examined during her earlier testimony, whether she had access to the pertinent evidence at the time of her earlier testimony or whether the affidavit is based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.  Id.

Here, plaintiff's affidavit does not directly contradict her earlier deposition testimony.  Plaintiff testified that she could not recall discussing the complaint with anyone else.  The record does not suggest that plaintiff was cross examined, and the examiner did not specifically ask whether plaintiff told Sheer about the complaint.  On this record, the Court will not disregard the affidavit.

[13]   During the time that Skibell supervised plaintiff, he had received e-mails from the corporate credit card service advising that plaintiff's account was delinquent and was being terminated.  Skibell also knew that plaintiff had used her corporate credit card for personal expenses while she was on a personal trip to Aruba.

[14]   After Skibell asked plaintiff about the expense report, he did not participate further in the investigation.

expense.

On September 1, 2004, Scheer noticed that plaintiff had booked a flight from Texas to Kansas City, and instead of booking a return trip to Texas, had booked a flight to California. Scheer thought this was unusual and asked plaintiff about it. Plaintiff stated that she intended to travel to California for personal reasons. Scheer determined that it would cost more for plaintiff to fly to California instead of returning to Texas. Plaintiff agreed to re-book her return flight to Texas. Plaintiff perceived that Scheer was very aggressive in her communications, and that her tone of voice was accusatory. In her six years of business travel at Sprint, plaintiff felt that she had never experienced this level of scrutiny for her expenses.

The same day, plaintiff e-mailed Pickett inquiring about Sprint's "no retaliation" policy. Pickett responded, "Retaliatory actions are not tolerated in general. Has something happened for you to ask?" Plaintiff's Exhibit 9 at 2. Plaintiff replied as follows:

> I was wanting to find a specific policy with guidelines and information on Sprint's stance to this. I'm noticing an unusual amount of effort in monitoring my time, expenses, business travel, and so forth. In my 7 years at Sprint I've never had my business travel questioned, monitored or researched. I've had similar expenses submitted in the past few years without question, suddenly everything is being looked at. I don't have anything to hide and feel I'm following policy so that is not the concern. It's just so sudden and out the norm for my management team that I was curious.
>
> *      *      *
>
> I just find it unusual that there is so much "activity" in monitoring me out of the blue.

Id. at 1.

On September 10, 2004, Pickett and Skibell telephoned plaintiff and told her that the compensation group decided to keep her at job grade level 75. When plaintiff asked for details regarding the decision, Pickett was very abrupt and argumentative and sounded aggravated.

Meanwhile, Scheer had contacted Carpenter and learned that while Carpenter supervised

11

plaintiff in 2002 and 2003, plaintiff used her corporate credit card to charge personal expenses, including a trip to Europe with her husband in 2002; plaintiff's credit card account became delinquent and was suspended during the same year; plaintiff had submitted excessive meal expenses; and plaintiff had submitted excessive out of pocket expenses – including a grocery receipt for a vaporizer and medication.[15]

On September 22, 2004, Scheer and Pickett telephoned plaintiff. Scheer asked about plaintiff's PCS phone charges in June of 2004, gas charges in December of 2003, and miscellaneous credit card charges for which Scheer did not specify the date or item purchased. The tone of the call was accusatory and threatening. Scheer and Pickett took turns asking questions about charges which occurred before June of 2004, and involved different dates and dollar amounts. The questioning was fast-paced and hard to follow. Plaintiff asked Scheer and Pickett to repeat their questions many times so that she could write them down. Plaintiff repeated the list and asked whether it included all of the charges which they questioned. Plaintiff also stated that it would be difficult to respond completely accurately regarding an expense report filed so long ago, in December of 2003. Plaintiff asked for time to research the items. Scheer responded that she had until 11:00 a.m. the following business day to review and explain the questioned expenses. Pickett ended the call by stating, in a threatening manner, that the matter was very serious. Plaintiff believes that Scheer and Pickett intended to confuse her by alternating between topics, dates and questions, and that they were retaliating against her because she had questioned her job grade assessment.

The same day, shortly after the call, plaintiff suffered an anxiety attack and had to seek medical attention. Plaintiff sent Pickett an e-mail which described her anxiety attack. Plaintiff asked

---

[15]     The record does not reflect when Scheer learned this information from Carpenter.

for clarification of the expense inquiry and the reason behind it. Pickett apologized for the manner in which she and Scheer conducted the call and provided an explanation for the inquiry.[16] Pickett also added dates of expense charges for plaintiff to look into, dating back to June of 2003, more than a full year earlier.

The next day, at 11:00 a.m., plaintiff, Scheer and Pickett had a telephone conference to discuss the expenses. Beginning in chronological order, plaintiff explained in detail all the expenses which they had questioned from June of 2003, to the date of the call. Scheer and Pickett demanded further explanation on some of the expenses and requested that plaintiff provide more detail by 5:00 p.m. that day. Plaintiff created a detailed spreadsheet which broke down all the expenses, dates and amounts in question. While plaintiff was researching the expenses, she discovered a calculation error on taxes which totaled $364. Plaintiff immediately offered to reimburse Sprint for the error, both verbally and on the spreadsheet which she provided Scheer and Pickett by 5:00 p.m. that day. Pickett insisted that plaintiff not reimburse the company for the miscalculation.

During a telephone conference later in the day, plaintiff asked Pickett about the next steps in the process of re-evaluating her job grade level. Pickett said that she would look over the information and get back to plaintiff the next day. Pickett stated that she wanted to complete the process by Friday, because she would be on vacation the next week.

On Friday, September 24, 2004, Pickett called plaintiff with questions regarding expenses. Plaintiff asked why the items were not questioned in 2003, at the time they were charged.

On Monday, September 27, 2004, at 8:30 a.m., Hall, Scheer and Mike Machell, human resources manager, telephoned plaintiff. Hall stated that she had reviewed plaintiff's situation with

---

[16]     The record does not disclose the reason which Pickett provided for the inquiry.

management and the legal department, and that after a thorough investigation, Sprint was terminating plaintiff's employment for falsification of expense reports. Hall also stated that plaintiff had been counseled in the past and that it was repeated behavior.[17]

After the termination, Sprint assigned some of plaintiff's training environment duties to Marshall Siegal, a delivery supervisor based in Ohio. At the time he took on the additional work, Siegal supervised nine telecommuter managers and trainers and was classified at grade level 76. Sprint assigned plaintiff's remaining duties to Smith, plaintiff's former team member.

During seven years of employment at Sprint, plaintiff consistently received merit raises for outstanding performance and professional conduct. Sprint never placed plaintiff on corrective action for any misconduct. During 2003 and 2004, plaintiff's supervisors gave her exceptional job performance reviews.

Plaintiff filed a charge of discrimination with the Kansas Human Rights Commission ("KHRC").[18] On May 2, 2005, defendant provided a position statement which asserted that Hall and Scheer learned of plaintiff's national origin in August of 2004, when she complained of discrimination with respect to the failure to increase her job grade level. See Plaintiff's Exhibit 1 at 7. On July 27, 2005, the KHRC issued a finding of probable cause that Sprint denied plaintiff a promotion because of her race and retaliated against her because she opposed acts and practices forbidden by the KAAD. See Plaintiff's Exhibit 2.

---

[17]     At an unspecified time, Scheer had alerted Hall to issues regarding plaintiff's past expenses, as well as the inflated expense report for her PCS phone bill in 2004. Hall and Scheer discussed their options with human resources and decided to terminate plaintiff's employment.

[18]     The record is unclear when plaintiff filed the charge, and whether she filed it with the KHRC or the Equal Employment Opportunity Commission ("EEOC"). Defendant does not assert that plaintiff failed to exhaust administrative remedies.

<u>**Analysis**</u>

Plaintiff claims that because she is Hispanic, defendant (1) did not promote her to job grade level 76; (2) investigated her expense reports; and (3) terminated her employment.  Plaintiff also claims that because she complained of race discrimination, defendant retaliated against her by (1) investigating her expense reports; and (2) terminating her employment.  Defendant asserts that it is entitled to summary judgment because plaintiff cannot establish a prima facie case or pretext on any of her claims.

**I.      Discrimination Claims**

Section 1981, Title VII and the KAAD make it unlawful for an employer to discriminate against any individual with respect to terms, conditions or privileges of employment based on the individual's race.  <u>See</u> 42 U.S.C. § 2000e-2(a)(1); <u>Hysten v. Burlington N. & Santa Fe Ry. Co.</u>, 296 F.3d 1177, 1180 (10th Cir. 2002) (Section 1981 affords remedy against discrimination in private employment based on race); <u>Best v. State Farm Mut. Auto. Ins. Co.</u>, 953 F.2d 1477, 1482 (10th Cir. 1991) (KAAD analogous to Title VII).  Because plaintiff presents no direct evidence of discrimination, the Court applies the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973), and <u>Tex. Dep't of Comm'y Affairs v. Burdine</u>, 450 U.S. 248, 252-56 (1981).[19]  <u>See</u> <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1225 (10th Cir. 2000).

Under <u>McDonnell Douglas</u>, plaintiff initially bears the burden of production to establish a prima facie case of discrimination.  411 U.S. at 802.  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.  <u>See</u> <u>Reynolds v. Sch. Dist. No. 1</u>, 69 F.3d 1523, 1533 (10th Cir. 1995).  If defendant articulates a

---

[19]      Plaintiff admits that she does not have direct evidence of discrimination.  <u>See</u> <u>Plaintiff's Response</u> (Doc. #31) at 40.

legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."  Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995)).

To establish a prima facie case, plaintiff must show that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination, e.g. defendant treated plaintiff less favorably than others.  See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1201 (10th Cir. 2006); Hysten, 296 F.3d at 1181-82.  Such a prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on consideration of impermissible factors." Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978).  In most cases, establishing a prima facie case is perfunctory, and liability turns on whether defendant's stated explanation for the adverse employment action is pretextual.  See Argo, 296 F.3d at 1201.

### A.      Failure To Increase Plaintiff's Job Grade Level

Defendant contends that plaintiff cannot establish a prima facie case of discrimination with regard to her claim that it did not increase her job grade level to 76.  Specifically, defendant asserts that failing to increase plaintiff's job grade level does not constitute adverse employment action because she did not experience a change in employment status, i.e. her job and pay remained the same.  See Defendant's Memorandum (Doc. #30) at 18.  To establish adverse employment action, plaintiff must experience "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

16

significant change in benefits." <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998).  The Tenth Circuit liberally defines adverse employment action.  <u>Hill v. Steven Motors, Inc.</u>, 97 Fed. Appx. 267, 278 (10th Cir. 2004); <u>Sanchez v. Denver Pub. Schs.</u>, 164 F.3d 527, 532 (10th Cir. 1998). Such actions are not simply limited to monetary losses in the form of wages or benefits.  <u>Id.</u>  The Tenth Circuit applies a "case-by-case" approach, examining the unique factors relevant to the situation before it.  <u>See Hill</u>, 97 Fed. Appx. at 278; <u>Sanchez</u>, 164 F.3d at 532.  Nevertheless, adverse employment action does not include "a mere inconvenience or an alteration of job responsibilities."  <u>Id.</u> (citations and quotations omitted).

Defendant argues that plaintiff's claim involves only the "reclassification" of her job grade, not a "failure to promote."  <u>Defendant's Reply</u> (Doc. #32) at 3.  Construed in a light most favorable to plaintiff, however, the record supports an inference that an increase in plaintiff's job grade level would have constituted a promotion.  An employee's grade level determines her compensation and benefits, level of responsibility and position within the company.  Moreover, the job grade increase would have resulted in a title change from Educational Consultant III to Educational Consultant IV. On this record, defendant has not shown that its failure to increase plaintiff's job grade level was not adverse employment action.

Defendant contends that plaintiff cannot demonstrate that the failure to increase her job grade level occurred under circumstances which give rise to an inference of discrimination.  Specifically, defendant asserts that plaintiff cannot show that she was qualified for a grade level increase, or that she was similarly situated to other team members who received an increase.  Construed in a light most favorable to plaintiff, the record suggests otherwise.  Skibell, plaintiff's supervisor, sought a grade level increase for his entire team, including plaintiff.  Skibell testified that plaintiff performed

necessary duties and that human resources did not understand how her role fit into the job description matrix. Moreover, after defendant fired plaintiff, it reassigned her duties to employees who worked in grade level 76 positions. On this record, a jury could reasonably find that plaintiff was qualified for a grade level 76 position and that defendant treated similarly situated employees more favorably. Thus, defendant has not shown that plaintiff cannot establish a prima facie case.

Defendant states that it did not increase plaintiff's job grade level because she performed a unique job which did not satisfy the job criteria for grade level 76. Because defendant states a legitimate nondiscriminatory reason for its action, the burden shifts to plaintiff to show evidence of pretext. Evidence of pretext may take a variety of forms. See Aramburu v. Boeing Co., 112 F.3d 1398, 1411 n.10 (10th Cir. 1997). Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted). Typically, a plaintiff demonstrates pretext with evidence that (1) defendant's stated reason for the adverse action was false; (2) defendant acted contrary to written company policy prescribing the action to be taken by defendant under the circumstances; or (3) defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse decision. See Kendrick, 220 F.3d at 1230. Plaintiff can show pretext under the third category by showing that defendant treated her differently from other similarly situated employees who violated work rules of comparable seriousness. See id. (citing Aramburu, 112 F.3d at 1404).

Plaintiff contends that defendant's stated reason for its action is false. Specifically, plaintiff argues that her job functions qualified for grade level 76. She points to the facts that (1) Skibell

18

advocated for a grade level increase for his entire team, including plaintiff; (2) Skibell testified that plaintiff performed necessary duties; (3) Skibell testified that human resources did not understand how plaintiff's role fit into the job description matrix; and (4) after defendant fired plaintiff, it reassigned her duties to employees who worked in grade level 76 positions.  In addition, plaintiff cites differing explanations by defendant.  In this suit, defendant states that it did not increase plaintiff's job grade level because the job matrix description for level 76 did not include IT functions which plaintiff performed.  When plaintiff asked Skibell the reason for not increasing her job grade level, he said that (1) as a telecommuter, plaintiff was not as visible as her peers; (2) plaintiff did not have a core project on which she primarily worked; (3) it was unfortunate that plaintiff was on short-term disability when the E Ticket project came in because that would have been a core project; and (4) Hall did not view plaintiff's "help desk" work as worthy of a grade level 76.  Skibell's explanation focused on plaintiff's poor visibility as a telecommuter and her lack of a core project – a term which he coined – neither of which constitute factors which defendant cites in this suit. Skibell did state that Hall did not view plaintiff's work as worthy of grade level 76, but he did not mention the job matrix description upon which defendant now contends it relied.  This discrepancy in explanations, combined with evidence that plaintiff's job functions qualified for the grade increase, creates a genuine issue of fact as to whether defendant's explanation is pretextual.  See Randle v. City of Aurora, 69 F.3d 441, 455 (10th Cir. 1995); Cole v. Ruidoso Mun. Schools, 43 F.3d 1373, 1380-81 (10th Cir. 1994); Roberts v. Air Capitol Plating, Inc., No. 95-1348-JTM, 1997 WL 446266, at *19 (D. Kan. July 22, 1997).  Defendant is not entitled to summary judgment on plaintiff's claim that it did not increase her job grade level because of race.

**B.**     **Investigating Plaintiff's Expense Reports**

Defendant contends that for purposes of establishing a prima facie case of discrimination, its investigation into plaintiff's expense reports does not constitute adverse employment action. Plaintiff responds that although the investigation "may not be recognized as an adverse employment action per se, it must be noted that the timing and circumstances of the investigation is a key aspect" of defendant's discrimination and retaliation against plaintiff. Plaintiff's Response (Doc. #31) at 44. On this record, plaintiff has not shown that the investigation constituted a significant change in employment status. See Burlington Indus., 524 U.S. at 761; See also Cardenas-Garcia v. Tex. Tech Univ., 118 Fed. Appx. 793, 794 (5th Cir. 2004) (disciplinary investigation not adverse employment action). Accordingly, plaintiff has not shown adverse employment action sufficient to establish a prima facie case of discrimination.

Moreover, even if the investigation constituted an adverse employment action, plaintiff has not shown that it occurred under circumstances which give rise to an inference of discrimination. Plaintiff asserts that upon assuming new supervisor duties, Scheer immediately began to investigate the expenses of plaintiff – the only minority on the team – and not the other team members. Plaintiff has not shown that the other team members submitted unusual expense reports and were not investigated. Plaintiff admits that Scheer began the investigation only after she noticed that plaintiff had submitted high PCS charges. The next day, Scheer learned that plaintiff had booked a more expensive return flight to California instead of Texas. Moreover, when Scheer discovered this information, she knew that plaintiff had a history of submitting improper expenses. Plaintiff points to no other employee who had a history of submitting improper expenses, submitted more unusual expenses and was not investigated. On this record, plaintiff has not shown a prima facie case of discrimination. Defendant is entitled to summary judgment on plaintiff's claim that it investigated

her expense reports because of race.

### C.     Terminating Plaintiff's Employment

Defendant contends that plaintiff cannot show that it terminated her employment under circumstances which give rise to an inference of discrimination.[20]  Plaintiff presents evidence that she was the only minority on the team, that she was a top performer and that defendant fired only her and not the lesser-performing non-minority team members.  These circumstances are sufficient to raise an inference of discrimination for purposes of establishing a prima facie case.  See Plotke v. White, 405 F.3d 1092, 1101-02 (10thCir. 2005).

Defendant asserts that it terminated plaintiff's employment because (1) she submitted a false expense report;[21] (2) she submitted personal expenses on her expense account; and (3) she used a company credit card inappropriately on multiple occasions.  See Defendant's Memorandum (Doc. #30) at 24.  Because defendant states legitimate nondiscriminatory reasons for its action, the burden shifts to plaintiff to show evidence of pretext.

Plaintiff argues that defendant's stated reason for the termination is false because (1) in defendant's position statement to the EEOC, defendant stated that it terminated plaintiff because she engaged in "unethical financial practices;" (2) in defendant's position statement to the EEOC, defendant stated that Skibell, not Scheer, inquired as to the high PCS phone charge in August of 2004, and that Skibell considered the matter closed; (3) upon assuming new supervisor duties, Sheer investigated expense reports which plaintiff had submitted more than a year earlier; (4) defendant

---

[20]     Defendant admits that the termination of plaintiff's employment constitutes adverse employment action.  See Defendant's Memorandum (Doc. #30) at 17.

[21]     The record is unclear whether the false expense report was the August 2004 report which reflected a high PCS phone charge, or another expense report.  See Defendant's Memorandum at 13, ¶¶ 79-80, 82.

did not provide the EEOC names regarding who decided to terminate plaintiff's employment; and (5) in defendant's position statement to the EEOC, defendant stated that Hall and Scheer became aware of plaintiff's national origin in August of 2004, and in this case defendant states that during the same period, Scheer did not know that plaintiff was Hispanic.  See Plaintiff's Memorandum (Doc. #31) at 58-62.  These facts do not necessarily present strong evidence of pretext.  Nevertheless, the record suggests that for some time, defendant knew of two of its stated reasons for termination – submitting personal expenses on her expense account and using a company credit card inappropriately – and did not take disciplinary action against plaintiff but instead gave her strong performance reviews.  Considering these facts, along with plaintiff's prima facie case, a reasonable jury could rationally find that defendant's explanation is unworthy of credence because of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions."  See Morgan, 108 F.3d at 1323.  Defendant is not entitled to summary judgment on this claim.

## II.    Retaliation Claims

Plaintiff claims that because she complained of race discrimination based on defendant's failure to increase her job grade level, defendant retaliated by (1) investigating her expense reports; and (2) terminating her employment.  To establish a prima facie case of retaliation, plaintiff must demonstrate that (1) she engaged in protected opposition to discrimination; (2) she suffered materially adverse action; and (3) a causal connection existed between the protected activity and the materially adverse action.  Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006) (citing Burlington N. & Santa Fe Ry. Co. v. White, --- U.S. ----, 126 S. Ct. 2405, 2414-15 (2006)).  Once plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  Id.  The burden

then shifts back to plaintiff to show that the employer's explanation is pretextual. Id. at 1203.

### A.    Investigating Plaintiff's Expense Reports

Defendant claims that for purposes of establishing a prima facie case of retaliation, its investigation into plaintiff's expense reports does not constitute adverse action. In Burlington N. & Santa Fe Rwy. Co. v. White, the United States Supreme Court found that the scope of the anti-retaliation provision under Title VII is broader than its substantive discrimination provision, i.e. that the anti-retaliation provision is not limited to discriminatory actions that affect the terms and conditions of employment. 126 S. Ct. at 2412-13. Instead, the Supreme Court found that to show adverse action for purposes of retaliation, plaintiff must show only that a reasonable employee would have found the challenged action materially adverse, i.e. that it would have dissuaded a reasonable worker from making or supporting a charge of discrimination. Id. at 2415. In light of Burlington, the record reveals genuine issues of fact whether defendant's investigation into plaintiff's expense reports constitutes materially adverse action for purposes of her retaliation claim.

Defendant contends that plaintiff cannot show a causal connection between her complaint of discrimination and its investigation into her expense reports. Plaintiff may establish a causal connection with evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct followed closely by adverse action. Morgan, 108 F.3d at 1325 (plaintiff must show adverse employment action motivated by impermissible retaliatory or discriminatory animus). Here, plaintiff complained of discrimination on August 5, 2004. Less than a month later, on August 30, 2004, Scheer began investigating plaintiff's expense reports. Defendant contends that when Scheer began the investigation, she did not know of plaintiff's complaint. Construed in plaintiff's favor, however, the record suggests otherwise. Plaintiff states that she told Scheer about

the complaint at a breakfast meeting on August 12, 2004.[22]  On this record, the close temporal

proximity between plaintiff's complaint and the investigation is sufficient to establish a prima facie

case of retaliation.  See Arnett v. Univ. of Kan., 371 F.3d 1233, 1240 (10th Cir. 2004); Conner v.

Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir. 1997); Ramirez v. Okla. Dep't of Mental

Health, 41 F.3d 584, 596 (10th Cir. 1994).

Defendant asserts that it investigated plaintiff's expense reports because Scheer (1) noticed

that her PCS charges seemed high; (2) knew that plaintiff had submitted improper expenses in the

past; and (3) learned that plaintiff had reserved a more expensive return flight to California instead

of Texas.  Because defendant states legitimate nondiscriminatory reasons for its action, the burden

shifts to plaintiff to show evidence of pretext.

Plaintiff contends that the timing and circumstances of the investigation show pretext.

Scheer's investigation began within three weeks of plaintiff's complaint of discrimination.  Standing

alone, however, close temporal proximity is not sufficient to demonstrate pretext.  See Arnett, 371

F.3d at 1240-41.  The Court must consider whether the evidence of temporal proximity combined

with other factors demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions" in defendant's explanation that a reasonable factfinder could rationally find it

unworthy of credence.  Id. at 1241 (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179

(10th Cir. 1999).  Here, in addition to close temporal proximity, plaintiff points to facts that

(1) Scheer looked at expenses which were more than a year old and which plaintiff's former

supervisors had already dealt with; (2) during seven years of employment, Sprint had never

investigated her with such scrutiny; (3) Sprint had never placed plaintiff on corrective action; and

---

[22]    Defendant also stated in its agency position statement that Scheer knew of the
complaint in August of 2004.  See Plaintiff's Exhibit 1 at 7.

(4) plaintiff consistently received merit raises for excellent performance and professional conduct. See Plaintiff's Response (Doc. #31) at 45.  Given these additional facts plus the close temporal proximity between plaintiff's complaint of discrimination and the investigation, a reasonable jury could find that defendant's stated reason was pretextual.  Defendant is not entitled to summary judgment on this claim.

### B.    Terminating Plaintiff's Employment

Defendant admits that for purposes of establishing a prima facie case, the termination of plaintiff's employment constitutes materially adverse action.  Defendant contends, however, that plaintiff cannot prove causation.  Defendant terminated plaintiff's employment less than two months after she complained of discrimination.  As set forth above, this close temporal proximity is sufficient to establish causation for purposes of a prima facie case of retaliation.  See Annett, 371 F.3d at 1240; Conner, 121 F.3d at 1395; Ramirez, 41 F.3d at 596.

Defendant asserts that it terminated plaintiff's employment because (1) she submitted a false expense report; (2) she submitted personal expenses on her expense account; and (3) she used a company credit card inappropriately on multiple occasions.  See Defendant's Memorandum (Doc. #30) at 24.  Because defendant states legitimate nondiscriminatory reasons for its action, the burden shifts to plaintiff to show evidence of pretext.

In addition to close temporal proximity, the record supports an inference that after plaintiff complained of race discrimination, defendant treated her more harshly for inaccurate expense reporting than it had in the past.  For many months before Scheer began her investigation, defendant had known two of its stated reasons for termination – submitting personal expenses on her expense account and using a company credit card inappropriately.  During this time, defendant did not take

25

disciplinary action against plaintiff, and her supervisors gave her strong performance reviews.  A reasonable jury might conclude that the difference in plaintiff's treatment resulted from a benign change in supervisors.  On this record, however, a jury could also conclude that defendant treated plaintiff's expense infractions more harshly because she had complained of race discrimination. Defendant is not entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #29) filed June 2, 2006 be and hereby is **SUSTAINED in part and OVERRULED in part.** The Court sustains the motion as to plaintiff's claim that defendant investigated her expense reports because of race.

The following claims remain in the case: (1) plaintiff's claim that defendant did not increase her job grade level because of race; (2) plaintiff's claim that defendant terminated her employment because of race; (3) plaintiff's claim that defendant retaliated against her by investigating her expense reports; and (4) plaintiff's claim that defendant retaliated against her by terminating her employment.

**IT IS FURTHER ORDERED** that Plaintiff's Motion For Leave To File Surreply (Doc. #33) filed July 26, 2006 be and hereby is **SUSTAINED.**

Dated this 25th day of September, 2006 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge